## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**v.**                                               **Case No. 6:16-cr-270-Orl-28DCI**

**JAMIE P. ESPOSITO**
_____/

### JAMIE ESPOSITO'S SENTENCING MEMORANDUM

Jamie Esposito, by and through his undersigned counsel, respectfully submits his Sentencing Memorandum. Without need for trial, potentially inflicting additional pain and suffering upon his child, Mr. Esposito entered a plea of guilty to counts three, four and six of the indictment. Factoring in the statutory penalty and the guideline application, Mr. Esposito has an exposure between 180 months' to 960 months' imprisonment. Through counsel, Mr. Esposito urges the Court to sentence him to a total of four hundred eighty months' incarceration. This sentence should be deemed as reasonable, appropriate, and just after taking into account the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

### PROCEDURAL HISTORY OF THE CASE

In January 2015, Mr. Esposito became a person of interest for involvement with child pornography by Homeland Security Investigations (HSI) through the arrest of a cooperating defendant. PSR ¶ 13. The cooperating defendant provided

information about a subject who communicated online regarding child exploitative material. *Id*. From January 2015 through November 2016, HSI conducted an investigation where they learned of various images of child pornography uploaded on to the internet. PSR ¶¶ 13-16. Further investigation with the assistance of Microsoft Corporation led to the unveiling of an address for Mr. Esposito. PSR ¶ 16. On November 29, 2016, HSI executed a federal search warrant at Mr. Esposito's residence where evidence was recovered of the indicted charges. PSR ¶ 17. On March 29, 2017, Mr. Esposito entered a plea of guilty to counts 3, 4, and 6 of the indictment.  PSR ¶ 7. Additionally, Mr. Esposito has been cooperative with the government in assisting to recover all sources that contain evidence of his crimes.

## APPLICABLE PENALTIES

The statutory mandatory minimum sentence is fifteen years for both counts three and four. PSR ¶ 136. Mr. Esposito is currently 32 years old and if sentenced to fifteen years, upon release he will be approximately 45 years old. However, if sentenced to forty years, Mr. Esposito would be approximately 70 after completion of his sentence. Upon release from prison, Mr. Esposito faces a mandatory minimum term of five years of supervised release up to a life term. PSR ¶ 140. He also must report as a sex offender with the state of Florida under the Adam Walsh Act. PSR ¶ 143.

The United States Probation Office has calculated Mr. Esposito's guideline range as total offense level 43, criminal history category I, for a sentencing range of life. PSR ¶ 137. Having considered all of the relevant information, policies, and circumstances, including, but not limited to the Guidelines, Section 3553(a), and the seriousness of the offense of conviction, Mr. Esposito respectfully requests that this Court sentence him to a term of forty years' imprisonment, followed by a lifetime term of supervised release. Such a sentence will provide punishment sufficient but not greater than necessary, to achieve the goals of sentencing.

### HISTORY AND CHARACTERISTICS OF JAMIE ESPOSITO

Mr. Esposito will be judged according to his actions but should not be condemned without first evaluating his life prior to the events that led to his arrest. There are little words that can eradicate the harm that was caused to the child in this circumstance. Mr. Esposito does not wish to diminish his responsibility or make excuses for his actions. However, there are identifiable factors that the Court can look to in determining why Mr. Esposito formulated the mindset that his actions would be acceptable. Recognizing the factors in conjunction with his overall history, the Court can be assured that this type of conduct will not occur in the future if Mr. Esposito is released.

Jamie Esposito is the second born son of Thomas and Debra Esposito. PSR ¶ 107. It appears that Mr. Esposito's older brother Christopher is the only son that

3

does not suffer from a mental illness[1] as his younger brother Joey is completely disabled and suffers from Autism and Obsession Compulsion Disorder. *Id*. Though lacking mental illness, Christopher has suffered from a drug and alcohol addiction. Ex. B. Mr. Esposito was raised alongside his two brothers in a home with both parents. PSR ¶ 107. Throughout childhood, Mr. Esposito's family struggled financially and was forced to relocate frequently. PSR ¶ 109. The instability proved to be overwhelming and chaotic for Mr. Esposito. *Id*. He recalls his father being verbally abusive and critical of his actions repressing affection towards his middle son. *Id*. Finding that his parents were an unbreakable unit, Mr. Esposito internalized his father's emotions which led to his inability to confide in his parents.

Thus, for the greater of 26 years, Mr. Esposito lived with his own demons that latched onto his mind and allowed him to do unspeakable acts to the child he helped create. When he was approximately seven years old, Mr. Esposito was sexually abused on multiple occasions by his family's landlord. PSR ¶ 111. He was made to watch pornography, sometimes violent; and was also forced to dress as a female while being ordered to perform oral sex on the landlord's son. *Id*. As time

---

1 Ex. B- "Family psychiatric history, as endorsed by Ms. Esposito, is remarkable for: attention problems (mother and both siblings), Depression (mother), Sleep problems (mother), heart disease (mother and grandparent), high blood pressure (father and grandparent), stroke (father), Autism (younger brother), problems with drugs and alcohol (older brother), and birth defects (younger brother)."

progressed, the landlord's son began to mimic his father's behaviors and became sexually aggressive and violent towards Mr. Esposito. *Id*. Unable to feel comfortable enough to approach his parents and stop the abuse, Mr. Esposito allowed it to continue until the son began his violent episodes. *Id*. At this point, Mr. Esposito was able to provide an innocuous reason so that his parents would stop sending him to the landlord's home. *Id*.

As Mr. Esposito developed into a young adult, the abuse no longer was forced upon him but there was a sense of power and control when an older woman accosted him for sexual gratification. PSR ¶ 112. At fifteen, Mr. Esposito was unable to appreciate the inappropriateness of the relationship. He bared the secrets of abuse for years unable to communicate the pain hidden inside his mind. This grew into depression as an adult and in 2008, Mr. Esposito was diagnosed with depression and social anxiety. During this time he married Tracie Esposito who was ten years his elder. Ms. Tracie Esposito provided the maternal comfort that Mr. Esposito desired without judgment or criticism. She encouraged Mr. Esposito in the pursuit of his education and helped to draw him out of his shell. PSR ¶ 124; *See also*, Ex. B. Although the marriage brought comfort it did not alleviate the debilitating anxiety that Mr. Esposito had in interacting with individuals in person.

Extending beyond his depression and social anxiety[2], Dr. Rochelle Taormina found that "based on his clinical history, it is likely that Mr. Esposito has been living in the community with and untreated, on-going mental health illness for an extended period of time." Ex. B. The social anxiety grew into isolation as Mr. Esposito feared leaving his home and interacting with others. PSR ¶ 119. Mr. Esposito sought treatment for his mental illness on various occasion but ultimately reverted back to the isolation instead of completing treatment. PSR ¶¶ 117-118; *See also*, Ex. B. The mental illness and isolation attributed to the abuse of his daughter. In 2013, Mr. Esposito stopped working and became completely financially dependent upon his wife. PSR ¶127. During this time, Mr. Esposito acted as the primary care taker of their daughter and created an admittedly unnatural affection towards her. *Id*. As a child, she became his friend and his confidant.

Looking beyond the horrific actions exists a genuinely kind hearted person with a terrible illness. Mr. Esposito's family, including his ex-wife[3], are unable to comprehend the existence of the man they all knew and loved and reconcile it with

---

2  PSR ¶ 121; *See also*, Ex. B. – Dr. Taormina opines that Mr. Esposito also satisfies the criterial for Post-Traumatic stress disorder, delayed expression, Persistent Depressive Disorder (Dysthymia) with anxious distress-moderate to severe; and Unspecified Anxiety Disorder.

3  Tracie Esposito writes in the victim letter about the Mr. Esposito they all knew and loved.

his actions that led to his facing judgment. His mother writes that the Jamie she knew was a "little boy who was so full of joy and wonder." Ex. A-1. She highlights that Mr. Esposito exhibited signs of a developmental disorder as early as age three. *Id*. She goes further to describe him as a "hyper-sensitive child growing up in an insensitive world." Around age nine or ten the "spontaneous joy of life" left his soul[4]. *Id*. His mother watched helplessly as Mr. Esposito was repeatedly bullied and abused in school.   Ex. A-1. Finally, due to the isolation, she withdrew him from school and began home schooling at age thirteen. *Id*. The child she raised and loves is one who is "generous, kind, polite, and so very naïve." *Id*. She has never known him to be "malicious, or manipulative." *Id*.

Other family members describe Mr. Esposito in the same light. His father recalls that "Jamie's life is full of kind deeds and actions." Ex. A-2. As a child, his father had to force him to stand up to bullies. *Id*. He also recalls that Mr. Esposito has a love for reading.   *Id*. The Jamie that his father knows is "[a] thoughtful, selfless, generous person who put others ahead of himself." Joey Esposito writes about a brotherly love reminding himself that the actions of Mr. Esposito are "unspeakable and incomprehensible" not seeking to justify or explain. Ex. A-3. To

---

4 This sudden change aligns with the sexual molestation by the landlord.

Joey and most others, Mr. Esposito is a person that was known for being "kind, helpful, protective, and loving." *Id.*

### THE NEED TO PROTECT THE PUBLIC, TO AFFORD DETERRENCE, TO PROMOTE RESPECT FOR THE LAW AND TO PROVIDE JUST PUNISHMENT

Protecting the public is not simply locking a person up for the rest of their natural life without the hope of redemption. In the instant case, the Court can consider several factors in determining a reasonable sentence to protect the public, afford deterrence, promote respect for the law and to provide just punishment. Undersigned counsel writes briefly on this matter but requests the ability to elaborate on this section at the time of sentencing. Counts three and four both carry a mandatory minimum sentence of fifteen years with a maximum exposure of thirty years. In setting a maximum term of incarceration, Congress made a statement that such an individual with similar charges can be redeemed; and thus, should be allowed to serve a portion of his sentence outside the confines of prison. Mr. Esposito respectfully requests that the Court sentence him to forty years' incarceration with a life time term of supervised release and determine that such a sentence is sufficient to protect the public and afford deterrence.

The need to protect the public from sex offenders derived in response to community outrage to the horrific rape and murder of seven-year-old Megan Kanka

by a convicted sex offender[5]. New Jersey enacted Megan's Law requiring all sex offenders to publicly display where they resided in the community[6]. Parallel legislation was enacted on the federal level creating conformity amongst the states[7]. In 2006, this legislation was replaced when Congress enacted the Adam Walsh Child Protection[8] and Safety Act, containing the Sex Offender Registration and Notification Act[9] ("SORNA").

In order to comply with SORNA state public websites must include:

> *The name of the sex offender, including any aliases.
> *The address of each residence at which the sex offender resides or will reside and, if the sex offender does not have any (present or expected) residence address, other information about where the sex offender has his or her home or habitually lives. If current

---

5 Karen Newburn, *The Prospect of an International Sex Offender Registry: Why an International System Modeled After United States Sex Offender Laws Is Not an Effective Solution to Stop Child Sexual Abuse*, 28 Wis. Int'l L.J. 547, 548-49 (2010).

6 Under Megan's Law, offenders must register their address with local authorities; they are placed into one of three tiers based on their perceived level of risk. Megan's Law, N.J. Stat. Ann. § 2C:7 (West 2005 & Supp. 2012); *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1243 (3d Cir. 1996).

7 Megan's Law, Pub. L. No. 104-145, 110 Stat. 1345 (1996) (codified at 42 U.S.C. § 14071(d)) (repealed 2006).

8 Adam Walsh Child Protection and Safety Act of 2006, Pub. L. 109-248, 120 Stat. 587 (2006) (codified in scattered sections of 8 U.S.C., 18 U.S.C., & 42 U.S.C.). *See generally* Lori McPherson, Practitioner's Guide to the Adam Walsh Act, Update: Nat'l Ctr. for Prosecution of Child Abuse, no. 9 & 10, 2007, at 1, available at http://www.ojp.usdoj.gov/smart/pdfs/practitioner__guide_awa.pdf.

9 Sex Offender Registration and Notification Act, 42 U.S.C. §§16911-29 (2006).

information of this type is not available because the sex offender is in violation of the requirement to register or is unable to be located, the website must so note.

*The name and address of any place where the sex offender is an employee or will be an employee and, if the sex offender is employed but does not have a definite employment address, other information about where the sex offender works.

*The name and address of any place where the sex offender is a student or will be a student.

*The license plate number and a description of any vehicle owned or operated by the sex offender.

*A physical description of the sex offender.

*The sex offense for which the sex offender is registered and any other criminal offense for which the sex offender has been convicted.

*A current photograph of the sex offender.

Office of the Attorney General; *The National Guidelines for Sex Offender Registration and Notification*, 73 FR 38030-01.

After 2006, the philosophy of paying your debt to society and then reintegrating back into society no longer existed for sex offenders, often times rightfully so. The current universe of sex offender laws presumes a uniform type of offender with uniform reasons for offending with relatively static strengths and weaknesses[10]. Individuals who are convicted of these crimes will always have a set of eyes monitoring their every move to ensure that this type of offense does not occur in the future, thereby protecting the community from further harm.

---

10 Chrysanthi S. Leon, *Sex Fiends, Perverts, and Pedophiles: Understanding Sex Crime Policy in America* 181 (2011); Paul Noroian & Fabian M. Saleh, *Residency Restrictions for Convicted Offenders*, 34 J. Am. Acad. Psychiatry & L. 422, 424 (2006).

Mr. Esposito readily admits that his behavior is harmful to society and wishes to obtain treatment while incarcerated so that harm will never come to another child. There is evidence that strongly suggests a low rate of recidivism among older citizens both as inmates and upon release from prison. If the Court were to sentence Mr. Esposito to a term of forty years, the need to protect society from other crimes of Mr. Esposito would then turn to whom he will have access upon release.

The ability to commit the instant offense was largely in part to his ability to have unfettered control and access over his daughter. At age seventy, it is likely that Mr. Esposito will have lost both parents and will hopefully maintain a relationship solely with his younger brother. It is equally unlikely that Mr. Esposito will have the ability to contact minor children and the Court can assist in assuring that he have no contact with any minor child. The Seventh Circuit last year provided some guidance to trial judges in considering a defendant's age at sentencing:

> There is much that federal sentencing judges are required to consider in deciding on a sentence to impose - maybe too much: the guidelines, the statutory sentencing factors, the statutory and regulatory provisions relating to conditions of supervised release, presentence reports, briefs and arguments of counsel, statements by defendants and others at sentencing hearings. But in thinking about the optimal sentence in relation to the problem of the elderly prisoner, probably the judge's primary focus should be on the traditional triad of sentencing considerations: incapacitation, which prevents the defendant from committing crimes (at least crimes against persons other than prison

11

> personnel and other prisoners) until he is released, general deterrence (the effect of the sentence in deterring other persons from committing crimes), and specific deterrence (its effect in deterring the defendant from committing crimes after he's released). A sentence long enough to keep the defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.

*United States v. Presley*, 790 F.3d 699, 703 (7th Cir. 2015).

Additionally, the United States Sentencing Commission publication: Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines (2004) reports that "[r]ecidivism rates decline relatively consistently as age increases" from 35.5% under age 21 to 12.7% for ages 41 to 50 years old for all defendants[11].

Courts have observed that, the reduced recidivism rate that comes with age is a valid consideration, pursuant to 18 U.S.C. § 3553(a). *Simon v. United States*, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005). Indeed, in sentencing the defendant in

---

11 *See*, www.ussc.gov/publicat/ Recidivism_General.pdf, pages 12, 28.

*Simon* to 62 months below the low end of the guideline range, the district court stated: "The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant." *Id.* at 48. In *Simon*, the court granted a substantial downward variance based on the fact that, with age, comes the reduced risk of recidivism, which lessens the need to deter the defendant and protect the public. Thus, this Court can take into account Mr. Esposito's projected age at the time of release in fashioning a sentence.

In looking at the factors of protecting the public and specific deterrence, a forty year sentence would clearly deter Mr. Esposito from committing any crimes upon release. The Bureau of Prisons offers residential and non-residential sex offender treatment that will assist Mr. Esposito thirty six months' prior to his release from custody. In addition to his lack of accessibility to children, either program will help assure the public that Mr. Esposito is equipped with the tools necessary to prevent reoffending.

In looking at the factors of general deterrence, promoting respect for the law, and providing just punishment, the undersigned would assert that Congress deemed this offense serious enough to require a mandatory sentence of at least fifteen years. A sentence of 960 months is not necessary to further the § 3553 factor of general deterrence since there is no correlation between punishment and reductions in crime.

13

*See* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> [T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent. *Id*. at 1031.

The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014).  In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment.  *Id*. Therefore, a forty year sentence can be deemed reasonable to promote respect for the law and provide just punishment for this offense.

## CONCLUSION

If the Court were to accept the proposed term of incarceration and supervised release, Mr. Esposito will have a lifetime of reporting, to the authorities, as a sex offender. The undersigned would submit that, given the above factors, a sentence of

forty years, followed by a lifetime of supervision, would be a reasonable and just sentence in this case.

Respectfully submitted,

DONNA LEE ELM
FEDERAL DEFENDER

s/ Alisha Marie S. Nair
Alisha Marie S. Nair
Assistant Federal Defender
Georgia Bar No. 806033
201 South Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: alisha_marie_nair@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that undersigned electronically filed the foregoing *Sentencing Memorandum* with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing to the following: Shawn Napier, Assistant United States Attorney, this the 22 day of August 2017.

s/ Alisha Marie S. Nair
Alisha Marie S. Nair

15

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                        **Case No. 6:16-cr-270-Orl-28DCI**

**Jamie P. Esposito**

_____/

## <u>APPENDIX</u>

Letters of Support ............................................................................................ A
*Debra Esposito, mother* ................................................................................*A-1*
*Tom Esposito, father* .....................................................................................*A-2*
*Joey, Esposito, brother* ..................................................................................*A-3*
*Robert and Tarwanda Staller, maternal grandparents* ...................................*A-4*

Report from Dr. Rochelle Taormina, Licensed Psychologist ......................................... B
(Report filed with PSR)

Honorable Judge John Antoon II
United States District Judge

Re: United States v Jamie Esposito

Honorable Judge John Antoon,

My name is Debra Esposito. I am a full-time caregiver for my son, disabled since age 12. He is now 24, and is the youngest of my three children. I am also caregiver to my husband, father of my three boys, who retired after becoming disabled in 2008. We have been married for 36 years. I have always been a stay-at-home mom.

I am Jamie's mother.

That sentence is more than just a statement of fact. My children are my life. Someone once said that having a child is like having a piece of your heart walking around outside of your body. For me this is true. When they're happy, I am happy. When they hurt, I hurt. I will always be their mother. My love for them is unconditional.

As a parent, from the day your child is born, you want to protect them, keep them safe, healthy, happy. You try as best you can to shield them from the unpredictable cruelties of life. You want to always be there when they need help. Be there to put the Band-Aid on. Wipe the tears away. Calm them down after a bad dream. Help them up when they fall. You just want them to know they are loved, and that you are there.

As they get older, go out into the world, make their own way, you still want to be that '"constant" in their lives. When Life throws a problem at them it's not going to be as simple as a scraped knee. You will offer advice, or just listen. And if you can, you will help them fix it.

But this...this is out of my hands. I can't fix it. I can't explain it. I can't even comprehend it. It's been several months since our lives were so unimaginably changed, and I still have not fully absorbed it. I live in a state of cognitive dissonance every day.

It is now in the hands of God, and the Justice system.

All I can do is tell you about the Jamie that I know. The beautiful child I raised. The little boy who was so full of joy and wonder. The hyper-sensitive child growing up in an insensitive world.

He started showing signs of a developmental disorder at a very early age, and was diagnosed with ADHD when he was 3. He always had to be moving, singing, running, creating. He could not sit quietly, his mind had so many ideas, his body had so much energy. He wanted every moment to be full of "doing".

This was not a problem in the preschool years. Yes, he was extremely impulsive, and

did not stop to think that his actions might be dangerous, or risky, or socially unacceptable. But I was a full-time mom, and I watched over him constantly, trying not to stifle his imagination, while also teaching him boundaries.

By the time he started school, he already knew basic math and had been reading since age 3. He loved to learn, but he was not challenged enough by his school work. He was restless and fidgety. He had problems with focusing, planning, and remembering. By second grade, I was told by the school to put him on medication, or find another school.

I found another school. A private one. Just a few weeks later, I picked him up at his new school, and he burst into tears, telling me that his teacher had put duct tape over his mouth because he talked too much. He said all the other kids were laughing, and made fun of him. That was when his spirit started to break. After much discussion with his Doctor, he started taking medication.

He began to dread going to school, and would sometimes throw up in the morning on school days. The slightest criticism would devastate him. By age 9 or 10 he had lost that spontaneous joy of life. He started to become withdrawn. He would spend a lot of time reading, playing his keyboard, or drawing. But he was not one to complain. Even if I asked directly he would say there was nothing wrong.

I watched him struggle with the demands of school and daily life, as he began to isolate himself more and more. I finally made the decision to Home School at approximately age 13.

Jamie seemed to be happier with Home Schooling. He had always been very shy, and as he got older, his shy nature caused him great anxiety when around people other than family. He was very self-conscious. He was also very, very naive and gullible. He had a hard time reading people. He once told me he could not understand "why people do the things they do", and he never felt like he "fit in". This caused him great pain, and quite often I would hear him in his room crying quietly, after interacting with other people, whether out shopping, or with visitors that stopped over.

When Jamie was 19, we moved to Florida. Jamie started working on his GED, and did very well with his classes. He planned on going to college. His goal was to be a Mechanical Engineer. But he still had great difficulty with social interactions. My heart broke for him, because I knew that he would soon be moving on with his life, moving out into a world that terrified him. When I tried to talk to him about his future, he would simply say, "Don't worry, I'll be ok".

But I did worry. Jamie was so sensitive, he seemed to feel too much. And naturally, as his mother, I wanted to protect him, knowing he would suffer as he learned to live on his own. This was my child, a piece of my heart.

The side of Jamie that I know is generous, kind, polite, and so very naive. I have never known him to be malicious, or manipulative. He was always good natured and

compassionate.

When he started living on his own at age 20, I did not think he was ready. He was still too childlike, too gullible and naive. He still needed support. I was terrified to let him go, but he was an adult, and there was nothing I could do except pray for him, and always be there as a backup.

A couple years later he told me he had been diagnosed with depression and social anxiety. I was not surprised to hear this since it is common for people with ADHD to also have depression and anxiety. I tried to be supportive, but Jamie did not like to talk about his problems. I never knew how much pain he was in until just recently when I learned of the numerous doctors, therapists, and specialists he had seen. I also just learned of his battle with severe insomnia, his diagnosis of Agoraphobia and PTSD, and his participation in Clinical Research Trials.

He had tried so very hard to get help on his own, but never spoke of these things to me. I never knew the severity of his mental anguish.

To my great sadness, I have also recently learned that he had been sexually abused as a child. I don't know why I did not see the signs. Once again, whether through shame, or under threat, he had said nothing. I still do not know the details. My duty was to protect him, and somehow I missed this. I don't know if I can ever forgive myself.

Even though he was going through a mental health crisis, he continued to attend college, trying hard to keep up, while his mental health deteriorated. He tried to hold down a few part-time jobs as well, but that proved to be difficult. He had issues with Executive Function: scheduling, commitments, decision making, prioritizing...it was overwhelming, and he had not acquired any coping skills for this disability.

He still did things for other people, neglecting his own needs. When someone needed help, he would drop everything and do what he could to help that person.

I don't know at what point he went off the rails. I do know that everyone who knew him was shocked and stunned. Every family member, his wife, his brothers, friends--no one ever expected something like this. Not one person saw any signs.

He is not evil. I know this in my heart. To the outside world, he seemed happy, always smiling, always ready to help. But on the inside he was dealing with his own mental health agony.

His inability to keep up with college caused frustration and guilt. His already low self-esteem suffered as he watched others obtain degrees, and excel in their careers, while he struggled just to get through the mundane details of daily life.

He was aware of the missed opportunities, but was unable to take advantage of them, and unable to understand why he could not succeed. He was in a never ending battle

**A-1**

with his own mind, knowing he needed help, but not knowing how to get it, or even how to ask. If he had only asked for help, I would have done whatever I could.

Your Honor, I pray that you will do what I did not get the chance to do: get him the help and treatment he needs. I ask for mercy for my son.

I am his mother. I know that the beautiful, loving child so filled with the sheer joy of life is still there. The light in his eyes may not shine as bright, but he is still there. I don't know how deep he may have buried his true self, in order to protect it, but he is still there.

The words that I am about to write are the ones I have dreaded the most. How do I speak about something that I can't yet understand or accept? Not only do I feel like I have lost my son, but also my grandchild. I miss my granddaughter so much, and I want to be a part of her life. But nothing is simple now. Nothing makes sense.

As Jamie's mother, I will support him and love him unconditionally. As a grandmother, I feel an ineffable sadness for my grandchild, for what has happened to her, and for what she will have to endure in the future.

Two lives have been changed forever, two beautiful souls that I love so much. I pray for them both.

Respectfully,

Debra Esposito

Honorable Judge John Antoon II
United States District Judge

Re: United States v Jamie Esposito

Honorable Judge Jon Antoon,

My name is Tom Esposito and I am the father of Jamie Esposito.   I currently reside in
Florida and have been a resident of the state for 13 years.   Previously, I was an
executive in the finance industry for 26 years in the greater Cleveland, Ohio area where
I was born and lived for 51 years.   I am currently retired, on disability, and live with my
wife, Debra, and our youngest son, Joey.

I come from a family where in every case, from my grandparents to my parents, to my
aunts and uncles and cousins, all children are beloved and cherished.   No one in my
family has ever been in trouble with the law.

Family get-togethers are joyful events that gather all of us for weddings, holidays and
birthdays.   We are by all measures, a great family where hard work, education, and
love of family and country have bonded every member of our immediate and extended
family.   That is what makes composing this letter so difficult.   There are no previous
experiences of any unlawful events to draw the words and thoughts from.   Although, for
that, we have been fortunate and blessed.

How can I begin to explain to you how Jamie has come to this situation in his life?   How
do I talk about what a gentle, cheerful, loving son he has been and balance that against
the deeds that he has committed?   It is truly as if there are two Jamies who are
diametrically opposite. This situation has confounded and deeply saddened all of our
family members.

By trying to tell you about Jamie and what a wonderful son he has been all through his
life, does this seem to minimize what he has done?   What makes this even more
unbearable is feeling that we have not only lost our son, but also our precious
grandchild. It is heartbreaking. Throughout all of this, we are always thinking of our
granddaughter, worrying about her well being.

But I must still try to let you know that this is so out of the realm of anything that Jamie
has ever displayed to any of us, that it is virtually unfathomable.

As a child, Jamie was as loving and well-behaved as any parent could hope for.   He
was a kind, thoughtful, and empathetic boy.   His teachers and classmates loved him
and he was never lacking in kind words and praise from everyone who knew him.   He
was as well adjusted in temperament as any parent could hope for.

Jamie's life is full of kind deeds and actions.   Once, when he was about 11-12 years
old, we received a phone call from one of his teachers who advised us that Jamie had
been argumentative that day with one of the other students.   This was surprising to us,
since it was so out of character for him.

I picked Jamie up from school, and on the way home I asked him what had happened.
He said to me, (as best as I remember), "Dad, you told me that I had to stand up to

bullies. Well, today I stood up to a bully for a kid who didn't know how to stand up to a bully. You were right, the bully left the other kid alone."

Your Honor, I am sure that you can imagine just how proud I was of my son that day.

When Jamie was a child he loved to read, and his favorite comic was *Calvin and Hobbes*. He collected all of the anthologies of the *Calvin and Hobbes* comic strip books. The author of the cartoon lived in Chagrin Falls, Ohio which happened to be the next town over from us. The author had stopped publishing any new works and had become somewhat of an infamous recluse, but now and then he would drop off signed copies of his books to a little book shop on Chagrin Falls' Main Street.

There was one book in particular that Jamie had wanted for his collection as the cover featured a popcorn shop that was a local, historic landmark on Main Street. My wife contacted the owner of the bookshop and was able to convince her how much our son wanted this particular book, and if it would be possible to let us know the next time the author dropped off his books. The owner agreed but said that they never knew which books he would be bringing in. Jamie was 14 at this time.

Some weeks later the bookstore owner called and said that Mr. Watterson, the author of the books, had just dropped off a box of books, and there was one signed First Edition of *The Essential Calvin and Hobbes*. She promised to hold it for Jamie if they could get there within the next hour as word spreads fast, and the books would be gone quickly. My wife and Jamie made it to the store in time, and with the book in hand, they took a quick look around the store and then headed to the register.

As they approached the register another customer rushed in and ran to the counter and asked if there were any copies of the book that had "Main Street" on the cover. The owner told her that there was one copy but that it had already been taken. The woman voiced her disappointment and turned away, walking past my wife and son with a very dejected look on her face.

Without a moment's hesitation or conferring with my wife, Jamie reached out and offered the book to her. At first, the woman said she couldn't possibly take the book, but Jamie insisted and handed it over to her, even though he had been waiting for a couple of years for a signed copy of that book.

This was exactly who Jamie was, and I believe, still is. A thoughtful, selfless, generous person who put others ahead of himself. Again, that is what makes his recent actions so hard to understand and accept.

I would like to write about what I consider his most significant and meaningful, long-term, series of acts that will hopefully show just what a wonderful son he has been.

Our youngest son was born with a heart defect and is autistic. He became disabled at age 12 when he was diagnosed with OCD. It quickly became severe and turned into a crisis situation. For nearly all purposes, Joey became unable to function. But still, during the darkest and hardest years of that situation, Jamie never wavered in his role as a loving, helpful and understanding big brother. This, in the face of a disability that

was so severe that, as Joey's Doctors warned us, historically tore many families apart.

Jamie was always there for us and Joey, and he spent numerous hours of his time with his younger brother, to assist him in many everyday activities that seem so simple, but were so difficult for him.   Jamie would drop everything he might be involved with to help us. It was pure love and unselfishness on Jamie's part, and his mother, brother and I are grateful to this day.

When considering the type of son that Jamie has been, how do I reconcile the actions that he has committed?   I believe that there is a way, at least for me.   While giving so much of himself to his family and others, Jamie concealed his own disabilities and difficulties.   We knew that Jamie suffered from depression, anxiety and ADHD but he never let on just how severe these items impacted his life and how hard he was fighting to treat and cope with it.

We now know that Jamie tried working with a number of mental health professionals, took the different types of medications and therapy that they prescribed, and when nothing seemed to work, he even volunteered for research trials in the hope that he could bring his depression and anxiety under control.   None of it worked, and virtually none of this, nor the severity were brought to our attention.

Throughout his own difficulties, I believe that Jamie did not come to us for support because he knew about the difficulties that his mother and I had with his younger brother, and he wanted to shield us from his own problems. He did not want to burden us with his issues.

I firmly believe that it was his deep depression that brought about other mental issues that hampered his ability to overcome his harmful actions.   I believe that his mental illness did in fact create two Jamies; the first, the greatest son that parents could hope for. And the second, a parent's greatest nightmare.   It is his second persona that is an aberration of who he truly is.

Jamie just could not overcome the depths of his depression and the compulsion that has caused the actions that have brought him to where he is now.   It is the effects of the disease(s) that he has suffered with for so many years.

A close friend of the family asked me if at any time if I have I felt like turning my back on Jamie for what he has done.   I told him no, no more so than if he were suffering from leukemia or cancer.   They are all diseases.

In conclusion, I can only ask, hope and pray that you will place Jamie in an environment where he can obtain professional help, and perhaps someday become a meaningful and contributing member of society.   Our son has always been there for us, and we will always be there for him.

Respectfully,

*Tom Esposito*

Tom Esposito

Honorable Judge John Antoon II
United States District Judge

Re: United States v Jamie Esposito

Honorable Judge Antoon,

My name is Joey Esposito, and I am Jamie's younger brother.   I live in New Smyrna
Beach with my parents.   Although currently on break from taking classes during this
difficult time, I am a student at Daytona State College, at the New Smyrna Beach
campus.

Jamie has done some truly unspeakable and incomprehensible things that I will not
attempt to justify, and can't explain. But what I can do is tell you how it was growing up
with him, and what he was like as an older brother. Even though he is smart, well read,
and generally well educated, I have never seen him as someone capable of rational
thinking.

Despite my being Autistic, and eight years younger than him, I could tell from an early
age that there was something different about Jamie. By the time I was ten years old, I
vividly remember thinking to myself that I had somehow passed him up, in both mental,
and emotional maturity.

This was very frustrating for me at the time, as I found him unrelatable, and our
interactions were limited in some ways. I felt like the older brother. However, over time,
I accepted that this is just how, and ultimately, what Jamie is; A child in a man's body.

Your Honor, I'm now twenty four years old, and I will go to the grave believing, and
testifying that there is no evil in my brother.   From as far back as I can remember,
Jamie was always the epitome of what an older brother should be.   He was kind,
helpful, protective, and loving.

As I got older, this did not change.   If I needed advice or help with anything, I could ask
him and know that he would be there for me.   And he was, multiple times, without
hesitation, even if he was busy, or having financial problems.

As an adult, he took any and every opportunity, of his own initiative, to bring light into
the lives of others, while never asking for anything in return.

Growing up with a disability wasn't easy, and my parents take very good care of me, but
Jamie went above and beyond to try to cheer me up with random acts of kindness,
generousity, and his company.

I can't make excuses for what he did, but I can tell you that he has always been a good
man, and mean it with all my heart.   He is more than just his illness.   Please send him

somewhere that he can receive the help he truly needs.

Respectfully,

Joey Esposito

Honorable Judge John Antoon II
United States District Judge

RE: United States v Jamie Esposito

Honorable Judge Antoon,

I am Tarwanda F. Staller and my husband of 52 years is Robert A. Staller. We now live in Vero Beach, Florida.  I am retired from the Department of Housing and Urban Development where I was the Assistant Chief of the Property Disposition Department in Phoenix, Arizona. My husband is retired from the United States Air Force. He is a veteran of Korea and Vietnam. His last duty station before retiring was with the Strategic Air Command's National Emergency Airborne Command Post out of Andrews Air Force Base. After retirement from USAF, his last work was with the IRS in Cleveland, Ohio. We both worked in Cleveland before I was transferred to my position in Phoenix. We are the maternal Grandparents of Jamie Esposito.

Jamie is the third oldest of our five grandchildren. He was always very shy but always wanted me to read to him when he would come to visit. When he was about 4, I was badly injured after being hit by a car while crossing a street in downtown Cleveland.  I was bed-ridden for quite a while. During my recovery, my daughter stayed at my house for two weeks to help out, and she brought Jamie with her. Several times a day, he would give me a really big hug so I would feel better. He said hugs always made you feel better. He was such a happy child, and always made me smile.

As he grew up he was always shy but very smart. He won awards at school for his writing ability and made good grades. He was also a very good artist. Jamie always impressed me with his politeness. He was so articulate, and his vocabulary seemed advanced for his age.  His knowledge of insects, plants, snakes, and science would always astound his Grandfather and me. He has always been a very caring person.

After we moved to Arizona we did not get to see him as often.  Jamie was about 10 when we left Ohio, but we kept in touch by phone, and would see him when we would travel back to Ohio, and then to Florida after he and his family moved to Orlando. Since retiring to Florida in recent years, we have visited with him on several occasions.

I can look back now and see that there were times when he seemed sad or distracted. Perhaps he was sad that we never tried to ask questions, and we just assumed it was a bad day for him, like we all have on occasion.  We find it hard to believe that he would ever intentionally hurt anyone.  It is our sincere hope that he will be placed in a facility where he can receive counseling and help for his problems. The Jamie we know and love would have been co-operative and hopefully that will be taken into account.

Respectfully,

Robert A. Staller
Tarwanda F. Staller

Dr. Rochelle Taormina, Licensed Psychologist

Report Filed with PSR